The next case on our docket this morning is 24-10520, Guevara v. Castro. I don't want to mispronounce your name, is it Falzerano? Yes, Your Honor, it is. Good morning, Your Honors, and may it please the Court. My name is Mia Falzerano, and I, along with my co-counsel, John Herman, represent Mr. Jose Leonardo Brito Guevara, who I will refer to as Mr. Brito during these proceedings. The District Court erred in multiple ways. First, it erred as a matter of law by not setting an expedited trial, as required by the Hague Convention and the International Child Abduction Remedies Act. Second, it erred by failing to consider both respondents and its own delay in its finding that respondent proved her well-settled defense. And third, the issue that my co-counsel will address, the Court erred in misapplying the PINA factors in finding that respondent proved her well-settled defense. An express objective of the Hague Convention is to secure the prompt return of children wrongfully removed from their place of habitual residence. And Article 11 of the Hague Convention is clear, and this is tab C in your binders. The judicial authority shall act expeditiously in proceedings for the return of children. Let me ask you this. In your initial brief, you alluded to the fact that it took 11 months for Venezuela to contact the State Department, and that was a big delay. Can you elaborate on that? Yes, Your Honor. And I believe that this was a point raised in Apelli's brief because that is an incorrect statement of the facts. In November of 2021, the respondent wrongfully removed the child from Venezuela. The Hague Convention application was filed in January of 2022, so about two months later. It then took until November of 2022, so a full year since the wrongful removal, for the U.S. State Department to send a notice to respondent. Now, we understand this delay, based on the information we have, to be a delay from the Venezuelan State Department getting the information to the United States State Department. I guess my point is, did it delay the filing of suit, and if so, how? Yes, Your Honor. That did delay the filing of suit because Mr. Brito waited until he was contacted by the U.S. State Department in December of 2022. So at this point, we are already a year past the child. Why did he wait? Being wrongfully removed. Because, Your Honor, he had no knowledge of how to proceed. He had already filed the Hague Convention application. And when he followed up with Venezuelan authorities and even contacted the U.S. Embassy, he was told that he needed to wait for the processing of that application. Unfortunately, in this case, that processing took over a year from wrongful removal. But that's not a statutory or anything else. He could have filed suit immediately. Yes, Your Honor. And in the record, it does state that he attempted to find counsel in the United States from being abroad, but was unable to do so. Once he filed the Hague Convention application and received the information from the State Department that he should wait for the processing of that application, he therefore relied on that information and did so. And, Your Honor, we are not arguing that Respondent couldn't raise the well-settled defense. We agree that suit was filed more than a year after the wrongful removal. But at the time that suit was then filed and ultimately transferred to the Northern District, the Northern District did not act expeditiously. And I don't believe that that fact is even contested by appellees. So for just some timelines here, the Fifth Circuit, excuse me, courts within the Fifth Circuit, have recognized a six-week timeline as a benchmark goal from the beginning, the commencement of proceedings through full adjudication. And this directive is in line with the circuits that have spoken on the issue, including the Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits. Here, Mr. Brito waited 11 weeks for any kind of communication from the Northern District. And this was after two motions to set an expedited trial. There was no communication from the Northern District. So that's almost twice as long as the benchmark goal for full adjudication. Then a trial was not set in the Northern District for 17 weeks. So his case waited without a trial setting for 17 weeks. That is one week short of three times the benchmark goal where he lingered without a trial setting at all. Ultimately, it took 33 weeks within the Northern District alone for this case to go to trial. And during that time, the child was able to – time continued to pass. So the child started kindergarten, for example. The case was transferred to the Northern District in August of 2023. That is the same month that the child started kindergarten. Had the case been set by the Northern District immediately upon transfer, as it should have under the Hague Convention, the facts that the child was in kindergarten, that she was in a gifted and talented program and took bilingual classes, those facts would not have been in the record at all. So Apelli, in their brief, argues that this is – that we are asking the court to exclude post-petition evidence. That is not the case. If the Northern District had acted with all due promptness, the facts would not have been in front of the Northern District. Now, the Northern District, in addition to not setting the case and erring for that reason alone, also erred in failing to consider both respondent and its own delay and the impact that that delay had on the well-settled defense. This case was initially filed in the Eastern District based on the information that Mr. Brito had available to him about the child's location. That came from the State Department. Apparently that's incorrect. That was incorrect. And he signed a stipulation that said it was incorrect. Your Honor, I disagree with that statement, and I know that that is what Apelli puts forth. On the record, on 535, what Mr. Brito said was, to avoid further delay of proceedings on the merits, Mr. Brito withdraws his opposition to Apelli's motion to transfer Venue to the Northern District. When Apelli – I thought there was a – I thought I read somewhere in the record, there was a statement that said, I realize now there was evidence that she did not live in Louisville when I originally filed the suit, and so that it was filed in the wrong venue. Your Honor, that is an argument that Apelli puts forth, but that language, to my knowledge, is not in the record. There was still conflicting evidence based on where the child was located. And rather than continue to litigate a transfer issue, Mr. Brito withdrew his opposition because he wanted to get to a trial on the merits. It's important to note, Your Honor, that when Apelli initially filed her motion to transfer, she provided no evidence to the Court at all, and none to opposing counsel. So at that point, faced with zero evidence, Mr. Brito did oppose. This was also after her having acknowledged notice of the suit still evading service for a month. And so there were clear delay tactics on the part of respondent. She then filed an evidence – or, excuse me, she then filed a motion to transfer with no evidence, and Mr. Brito opposed, believing it was another delay tactic. When presented with even some evidence, and it was not conclusive, that the child could have been in the Northern District, Mr. Brito withdrew his opposition because he believed that would get him to a trial on the merits as soon as possible. Now, hindsight being 20-20, it seems that he should have stayed in the Eastern District because that district set a final trial within that six-week benchmark goal, as opposed to the Northern District, where this case ultimately was pending as the longest bar one Hague Convention case in the Northern District. And for these reasons alone, the fact that the Court did not promptly set the trial and then failed to consider both respondent's delay and its own delay, this Court should reverse the Lower District. Quick question. The record indicates that Mr. Brito has been, because of work, living in Spain. Yes, Your Honor. Since 21, hasn't been to Venezuela since then. Is that correct? That is correct, Your Honor, and if you'll permit me a moment to answer that question more fully. The record is clear that a few months prior to Apelli wrongfully removing the child, he went to Spain for a higher-paying job that he fully intended to spend just a few months in Spain and then return to Venezuela. During the time that he was in Spain, Apelli removed the child, and he's testified in the preliminary injunction hearing and at the trial that if the child is returned to Venezuela, he will be on the next flight back. He has a job lined up in Venezuela. He has housing in Venezuela. He has put aside money for a plane ticket to go back to Venezuela. He has told his boss in Spain that he will be leaving his job and going back to Venezuela. He has packed up his apartment. The only reason he has stayed in Spain is to make additional money while his child at this point is not in Venezuela to better provide for her when hopefully she does ultimately return. Thank you, Your Honor. Just one more clarification. The grandmother of the child is no longer in the appeal right? Correct, Your Honor. She's not claiming any custodial rights based on the guardianship? That is correct, Your Honor. She is not part of the appeal. To be very pointed, she's not claiming any custodial rights such that if the child were sent to Venezuela tomorrow, she would be at the airport to pick her up, take her to her home, and raise her under her custodial? No, Your Honor. And in fact, Respondent testified that she would return to Venezuela with the child. So if this court orders that the child be returned, we fully believe that Respondent would be the one taking the child on the airplane to Venezuela and most likely bringing her to either her home or her parents' home pending any kind of custody dispute in Venezuela which is the proper forum for that dispute. Thank you, Your Honors. Good morning, Your Honors. And may it please the Court, John Herman also for appellant, Mr. Brito. Even setting aside the numerous and extensive delays that my colleague just addressed, it was error to hold that Mr. Brito's child was sufficiently situated in the United States to override the Convention's mandate to return her to her home country. Both the State Department and this Court have held, or have rather construed Article 12's well-settled exception to the return remedy to require nothing less than substantial evidence of significant connections to the United States. And Article 12 places the burden on the abducting parent to make such a showing. That exception does not simply look to whether the child is happy in her new environment or whether she appears to be living in a supportive and loving home. It is instead a very narrow exception that is available only when a child's unlawful entry into the United States has given way to a permanent and stable relocation such that the uprooting of the child would be harmful enough to override the Convention's central pillar which is to allow contracting states to determine the fates of their own citizens. And so for that reason, we asked the Court to reverse and render an order that the child be returned to her home country. It seems to me the only factor cutting against permanency is the immigration status of the mother and her partner. I'll start with the District Court's findings. So the District Court found both that the immigration status of the mother and her partner cut against well-settledness. The Court also found that the child's age, she was five, she had just turned five at the time of the hearing. That also cut against the well-settled determination. But the totality of the evidence, which is the north star of the analysis, fell far short. The record is actually quite thin in establishing that she was well-settled. And the District Court characterized both those factors as, quote, lukewarm, which not only had no support in the record, but was also the result of a failure to probe the evidence as she was required to do under this Court's precedent in Peña. I'll address two errors, but, again, I'll refer the Court to a brief which discusses how the totality of the evidence did not rise anywhere close to the degree of substantial evidence of significant connections. So one error the Court committed was that it failed to adequately probe the immigration status of the mother. Yes, the Court found that the mother was not a lawful resident in the United States, but, again, cast that factor aside as lukewarm because the Court noted that she had a pending asylum application and that she had temporary employment authorization. It seems as if the focus of the Court's analysis was whether the mother was in active deportation proceedings, which was the focus of this Court's decision in Peña. In other words, the Court focused on the present rather than the effect of the mother's immigration status. So while she's not, as far as we know at this point, given the passage of time, subject to immediate deportation proceedings, what we do know is that she has a pending asylum application, but that's it. The Court didn't probe the credibility of that asylum application, did not examine the likelihood that she would be deported and that the asylum application would be denied. And while, of course, we're not asking for a trial within a trial, the importance of that factor... Did your client put on evidence about that? We cross-examined the respondent as to the conditions in her home country. Now, it's a bit delicate. Of course, asylum applications are confidential. And so I'll back up by saying first that the asylum application, while before the Court in an earlier filing, was ultimately not part of the record. And so we cross-examined the respondent as to the conditions of her home country, both with respect to her asylum application and as it relates to the grave risk exception that she also argued that the child should not be returned to Venezuela because of a grave risk to her welfare. Is your best case for the proposition that the District Court should have taken a deeper dive into the asylum application? That would be Pena, Your Honor. But you've already argued that this case is distinguishable from that one because there were deportation proceedings going on in that case. That is correct. That is correct. And Pena, I think, number one, stands for the proposition that if there are active deportation proceedings, of course there's an imminent threat of deportation and that the child is therefore not well settled, that there's a lack of permanence in her residence here. But what Pena also holds, and I think that the broader principle in Pena, is that the Court must examine the facts underlying the parent's immigration status, that it should not take any kind of labels at face value. Here, the fact that she has an asylum application is just the first step in determining whether a parent's immigration status risks uprooting the child such that she might get deported anyway if her application is denied. And the evidence we see in the record is that there was no threat. And the respondent conceded that there was no one who she could identify that posed any risk to her daughter. She even testified, as my colleague addressed, that she would return to her home country in a heartbeat. And as that related to her asylum application, the only thing she said was that it would undermine the likelihood that her asylum application would be granted if she were to leave the United States. And so the evidence shows that, well, it's quite thin, that the mother, in fact, had a likely path to remaining in this country. It certainly didn't arise to the preponderance of the evidence standard that she had her burden of proving. Well, that was my first question out of the box. It seemed to me that, of all the factors, you're giving predominant weight to their immigration status. It is certainly a very important factor, Your Honor. And this court has held that there's no one factor that takes weight over another as a matter of law. It's a totality analysis. In this case, it was error to not probe the immigration status because of what a significant effect it would have on the child and her mother if, in fact, her asylum application is denied. But you can't tell us what, had the district court probed, what she would have found. Well, there was evidence in the record that the asylum application was based on thin evidence, that there was no testimony that there was any danger, and, in fact, there was testimony to the opposite. If I could briefly just address one more erroneous fact that the court found, but, again, I refer the court to a brief because the totality of the evidence should guide the analysis, that the court found in holding that the child was well settled that the child attended daycare and school consistently since arriving in the United States. The record contains no such evidence. In fact, the only evidence we have of the child's daycare or school attendance began in August of 2023, months after the petition was filed, when she first started kindergarten. And so the evidence shows that there was not this consistent attendance that would otherwise indicate deep roots in the community and a long established presence in school or daycare. I'll see that my time is up. I will reserve the rest of our time for rebuttal. Thank you. Good morning, Your Honors. My name is Roger Disiker. I'm here and pleased to be here on behalf of the appellee, Castro, and her daughter who we've referred to as the child or AF because of the confidentiality provisions. Traditionally, when we start an argument at your court, we begin with, but given where we are and we're so pleased to have you in Fort Worth, I think we should start with a howdy. Traditionally, at A&M, howdy gets a response call. Okay, so I'm going to turn immediately, before launching into my outlined argument, to something that was just raised about the weighing of the immigration status. First, the court is well aware, under Pena and all the other circuit courts that have addressed this issue, that immigration is not a decisive factor. However, the new test that Brito's positing here puts a mother like Castro in a Sophie's choice. They're trying to use her testimony that she would accompany the child back to Venezuela, where there is no one with legal custody, and there are no circuit court cases dealing with that issue, but we have found a district court case, citing in our brief, called Newman v. Newman, out of Michigan, where a father had a temporary assignment with Ford in Mexico. The custody proceeding got started in Mexico. He moved back to Detroit, and the court there found the father's promise to go back to Mexico if there was a return of this child was not sufficient, didn't satisfy those prongs under the Hague Convention. So the point being, this argument that the district court should have, one, probed Castro's immigration or asylum application, is an incorrect statement of the law and not a warranted extension under the law, but also creates this false Sophie's choice for this mother, who of course is going to return to Venezuela with her child, because there is no one there who has custody or legal custody of the child. So let me return now to a brief overview of the facts concerning the delay here. There is no dispute in the record that Brito left the child in Venezuela and moved to Spain to stay. It's never returned to Venezuela, hasn't come to the U.S. There's no dispute Castro then brings the child to the U.S. on November 17, 2021, legally presents herself. At that point, how many months had expired since the father had seen the child? A couple of months, Your Honor. That's what I thought. A couple of months. However, Castro is granted temporary status as an asylum seeker, immediately moves to the Dallas area, moves in with her then partner, and I'll report to the court that she and Oton are now married. So Oton, the father figure, as cited by Judge Brown, is now the legal stepfather of the child. But Castro and the child immediately move to Dallas, take up residence in one of the two apartments, the only two places they've lived in since they've been in the U.S. Castro immediately begins work, immediately enmeshes the child in her extended family in the area, all found by Judge Brown. As Judge Brown said, the evidence was overwhelming of these issues, and the child immediately begins participating in family-offered daycare because Castro immediately starts working in December upon arriving in Dallas. All these are important because they go to the well-settled argument that I will finish with, but also because so much time then passes because of what Mr. Brito is not doing. His brief is full of blaming everyone in the system for his delay. The Venezuelan government let him down. The U.S. State Department let him down. And by the way, Brito gave the State Department a wrong address and a wrong email address for Castro where she could have been notified of this lawsuit. The record is indisputed that he finally decides to take legal action in the U.S., finds lawyers in January of 2023. January. They don't even file a lawsuit until April 19, 2023, injecting another three-and-a-half months of delay into the proceeding. Now, I'm going to turn to what the appellant describes as the fundamental question at stake in this appeal, and I'm going to quote from their reply brief at page one. The fundamental question at stake in this appeal is whether a parent who wrongfully abducts her child from her home country and unlawfully crosses United States borders with her can nevertheless evade the Hague Convention's return remedy by running out the clock. The appellant has filled the record from the time period before Castro retained counsel and appeared in the lawsuit with allegations of evading service, and we've heard a little bit of that here. There's no actual support for that in the record by way of evidence. What did happen was that our firm was contacted by, as soon as Castro knew there was a lawsuit against her, she sought out counsel, found counsel within 30 days. My law firm files a notice of appearance because my law firm check-paced her. We saw what had been going on. There was a temporary restraining order hearing, a preliminary injunction hearing. We file a notice of appearance. Now, the findings and the things from the record that Castro relies on for this allegation of evading service, well, so there's an analogy from sports that it's really easy to score against air. What that means is, like, if your offense for playing basketball, if your offense is out on the court running plays against no defense, you better make all your baskets because there's no one there to challenge you. And I submit to the court a lot of what Castro relies on as evidence of Castro evading service is scoring points against the air because there's not a defense there. So our team files this notice of appearance. Judge Jordan in the Eastern District sees the notice of appearance, has a phone status conference as depicted in the record. Our team says, we're going to file a motion to transfer venue. He says, file it. I will set you a hearing. We file a skeletal motion. He holds an evidentiary hearing on July 14. All these issues get fleshed out about the issue of whether or not there was evasion of service. He tells the parties, go exchange some documents, work through this. That's when Brito concedes he's in the wrong district and we move to the Dallas District Court. Bigger issue here, though, is has Castro preserved the arguments that he has, I'm sorry, has Brito preserved the arguments he's relying on here? Because I submit all of this has been waived at the trial court level because this issue of every party, every judicial branch actor, every administrative branch actor who Brito asserts will let him down and cause delay. The Venezuelan government, the State Department, Judge Brown in Dallas. Judge Brown never had an opportunity to address those issues, to rule on this idea that she should ignore evidence that was submitted that occurred post some arbitrary time that Brito submits post-complaint evidence shouldn't be considered. They never set out a date in their briefing. But there's some point where they want this equity to be ignored. Now, I argue that's equitable tolling and it's been rejected by Lozano at the Supreme Court. I don't know what else you would call it. If there's going to be a bar on evidence past some certain date, there has to be an equitable tolling rule then to support that. Or a party has to make an objection to the evidence coming in. That's not their argument. They're just saying had this all been timely resolved, these facts wouldn't even exist. They're not trying to keep it out of evidence. They're just saying on the prejudice piece of it, they were prejudiced by the delay, the court's delay. I agree that's the argument they try to get to at the end of the reply brief. However, all of these factors, all of the evidentiary factors that Judge Brown considered and all of her findings about this child being well settled in Dallas, they began happening in December of 21 when the child first moved here. And that was the import of my introduction is that Castro crosses the border, presents herself to immigration, goes through processing, gets her temporary work papers. The child gets the temporary work documents. All of those are on the record. And she comes immediately to Dallas, moves in with her now husband, Oton, and begins a life. If Brito had immediately acted to enforce his rights, all the policy provisions in the Hague Convention would have been in his favor because the Hague Convention and the ICARA statute strongly, strongly support the idea that it is in the best interest of the child to have the custody dispute determined in the country of residence, habitual residence. However, if a litigant, if the aggrieved parent who's living in Spain, if the aggrieved parent sits on his rights and waits a year, then the well settled defense becomes effective. It is in play. What does the record say about when Brito knew where she was? I think you all's brief says they were texting or phoning or something. When did he know where she was in the United States? There's no finding by Judge Brown on that issue. One, because Brito didn't ask for it, didn't raise the issue to make this challenge. And the other piece of that waiver issue, then, is that Castro's team never gets a chance to respond in the evidence we put on. So there's two parts to this waiver. And second, Your Honor, the evidence that's in the record is that they were texting all the time. And by they, I mean Castro and Brito. He knew she was in the States. He knew where they were. He knew what street address and what city, what state? Yeah, I would submit, yes, they did, Your Honor. Where in the record can I see that? Where can I go and look at that and say, yep, that's there? I will submit that in a post-hearing brief. And if I don't have an exact record reference to it, I will submit that as well. However, Your Honor, that's not Castro's burden. If Brito is going to seek this new remedy under the statute and under the Hague Convention of excluding all this evidence that he says happened after some arbitrary point where the district court shouldn't have relied on this evidence, he's got to make that point. If he's going to argue evasion, he should have pressed the issue and sought a ruling from Judge Jordan in the Eastern District. Judge Jordan held a multi-hour evidentiary hearing on this issue on July 14th. And if you read that transcript, I think you will come away with the impression that Judge Jordan had decided there was not evasion and sent the parties out to exchange additional evidence. And that's when Brito agrees to move the case to the Northern District. Further, Your Honor, this issue gets put to bed as a waiver issue. Did he just agree to move the case, or did he agree that the evidence was sufficient to establish that Castro and EF lived in a Northern District? I think you have to agree that the evidence is sufficient that they live where venue is appropriate. So he made that, he conceded that on the record or in some filing? No, there's not an express concession that, oh, gosh, we are wrong. However, there is a concession to transfer venue. I think your co-counsel might disagree with you. Well, he's furiously screaming. And herein lies the problem of appellate counsel not having been trial counsel. But I'm sure Mr. Sotomayor will pass me a note in a minute and correct me. However, the final answer to your question, Your Honor, is found in the pretrial order, right? Because they don't raise this issue in the pretrial order either. They don't raise this issue in the complaint they filed. They don't raise it in the pretrial issue. I mean, excuse me, the pretrial order, which governs the case. They don't raise it in their trial brief. They don't introduce any evidence about it at trial. And, again, it is not our burden after the case is transferred to the Northern District. We said the Northern District's appropriate. They finally agreed to transfer. Your client had the burden to show well settled. And I'm just trying to get an idea of when did well settled start? You're talking about kindergarten, and I'm talking about what happened way before kindergarten. Who was doing what? Yes, Judge Richmond. And if you look at pages 20, 21, and the top of page 22 of Judge Brown's findings of fact, she goes through all of the factors she considered and the evidence that was introduced. And she found it to be overwhelming evidence that the child was well settled. To directly answer your question, the well settled evidence begins in December of 2021. Like I said, Castro is admitted, granted asylum seeker status, immediately moves to Dallas, moves to the first address in Louisville, which is in the Eastern District, begins working so there's financial stability. She gets a job in December of 2021, and that's in Judge Brown's findings. And Rito stipulated to that fact. It stipulated to the addresses where everyone was living. So it begins December 2021. The only thing that happens in August of 2023 is that AF gets her shot so she can start school on August 14th. And then she starts school on August 14th, same day, starts kindergarten. Before that, every other factor in the Pena test has already occurred. The stability of the family life. She was attending church. All the extracurricular activities she was involved in at church and the birthday parties and the family trip to Disney World. All of that occurred before this arbitrary August 14th date. It begins happening in December of 21 when the mother and child moved to Dallas. And it's continuing today until today. This problem exists because Rito sat on his rights and did not follow suit. That's what you keep saying, sat on his rights. I just want to know, when did he first know where she was? That's a simple question. You keep saying he sat on his rights. I want to know when, you know, when did he know where she was? Your Honor, I will find the exact record site. However, if you look at Lozano, I mean, Lozano is perfectly addressing this issue. In that case, that child was hidden from the father, and he was looking for her, couldn't find her. The family was lying to him about where the child was, and he sought an equitable ruling in the Supreme Court. Then your response should be, it doesn't matter. But you keep arguing affirmatively that he sat on his rights. So there's a dissonance here. If you're going to pursue that, then I want to know what the facts are. If you're going to say it doesn't matter, then quit saying he sat on his rights, if it doesn't matter. Well, I can answer. To remove the dissonance, he certainly knew within one year and could have filed this lawsuit in federal district court within one year. And show me what the evidence of that is. If that's your argument, I just want to know where's the factual support. Or you could say I shouldn't have said it, I'm not arguing that. Your Honor, I will find the exact citation to it in the record. I am confident that he knew and was well aware of where they were. Because he was in near constant communication with the mother and the child throughout this time. They knew where the child was. I mean, they started their hate convention action in Venezuela, so they knew where the child was. That's part of their complaint. This child was removed, taken to the States. You've got to know where the kid is to start that process. It's not Louisville that the grandmother did. Louisville is listed in the custody of the Venezuelan courts. Right, so they knew. They said Louisville, but now you all say, no, she wasn't in Louisville. She was somewhere else. My apologies, Your Honor. This is a moving target here. Yes, Judge Richmond. It's not a moving target, and it's my fault that the court thinks it is. This child lived in Louisville when she immediately moved from Arizona after presenting for asylum. They lived there for a year, and then they moved to the address in Dallas. And Brito knew where the child was at all times in there. And that's in Judge Brown's findings. Heck, the parties stipulated that as part of the pretrial order. I think that's around page 14 in her findings of fact. Let me address very quickly. Let me ask you a random question first, and you may not know the answer. So how has the immigration status, the stability of that immigration status of your client in AF? So new president took office 35 days ago, announcement of new policies. And you may not know the degree to which, if at all, the stability or state of your client's immigration status has changed. The state of her immigration status has not changed. She's an asylum seeker still seeking her interview with Customs and Border Patrol. Okay, so that's still the current procedural status. Procedural footing, yes, Your Honor. And I think that is why all courts of appeals who have addressed this, and I think it's all the circuits now, in this court under Pena say that immigration is not a deciding factor because, frankly, that changes every four years. So as things stand now, she's an asylum seeker with temporary status. So if the father of the child wants to initiate custody proceedings, if we affirm what happened in the district court, that will have to occur in the United States. Yes, Your Honor. And he could have started those proceedings the day they knew they were in Louisville. I mean, he could always come here and start the proceedings. And there's no timing. We know of no timing on future asylum proceedings as of now. No, Your Honor. I might have a little leave to respond to that. No, Your Honor, that has not been set. And, frankly, to address your actual question, I mean, the real question we're getting at here, Judge, well, they're firing immigration judges left and right too. So I have no idea what that process ultimately looks like. But I have read that as part of the DOJ committee leaning down on the federal government, they're firing immigration judges. Has he been petitioned for custody in Venezuela if he hasn't been there for a certain amount of years? Your Honor, I do not know the answer to that question, whether he would have standing under Venezuelan law to make that application there. I do not know that. No more questions? I will yield. Thank you, Your Honors. Your Honors, I'd first like to begin on rebuttal by clarifying a few of the factual issues that came up. Now, we just heard a statement where it said Mr. Brito can always come here to initiate custody proceedings. And earlier in the argument, we heard him, appellee's counsel, say something like Mr. Brito could have come here. But that is not true. Throughout the record, it is clear Mr. Brito tried to come here and his visa was denied. If the child remains in the United States, he will no longer be able to see his child, period. Do we know if he can initiate proceedings in Venezuela at this point, given his absence? Your Honor, not being a Venezuelan attorney, I'm not sure of that. We do know that he has custody rights under Venezuelan law. He has never given up any of his custody rights. And the fact that he has been in Spain, where he is a dual citizen of, he is both a citizen of both Spain and Venezuela, if he returned to Venezuela, I don't see anything stopping him from initiating a custody proceeding. And the Venezuelan court will take into account any facts that it wants to consider. Why was his visa denied? He was not able to get a reason for why his visa was denied. He tried reapplying. It was denied again. He contacted a Venezuelan attorney who said that it would be best to wait three to five years for another application. And he did not have any further information, nor did the Venezuelan attorney. But it is not as simple as him just saying, I'll get on a plane and come here. And that is throughout the record. Secondly, Mr. Brito testified that a respondent did not give him her exact location. She would tell him the general area that she was in, so Louisville or Texas, or Dallas in Texas. But he did not have an exact location. And the location that was used was from a piece of mail that she sent him a picture of with the asylum application and mail that she'd received from the immigration office. So that was how he had the address. It was not because respondent provided this. But I'd also like to turn to the well-settled factors that Judge Richman, you raised. All of them are based on school and daycare. And you can see that on pages 21, 22 of Judge Brown's finding. So she finds that the child started kindergarten in August of 2023, that she has been photographed with friends from school, that she is in a gifted and talented program, that she receives bilingual education at school, that she went to a primary care physician, and we heard that that was because she was starting school, that she is learning English, that she goes to community playgrounds, attends friends' birthday parties from school. All of these tie in to her beginning school. If this case had been set in August of 2023, even September of 2023, when we have six weeks, 12 weeks passing from transfer to the Northern District, not from the commencement of proceedings, if I may finish this one sentence, Your Honor, these facts would not have ever come before Judge Brown for her to consider. And that was the entire basis for the well-settled, for finding that respondent proved the well-settled defense. Thank you, counsel. Thank you, Your Honor. That will conclude this morning's arguments. The court will take a recess and convene again at 9 o'clock in the morning. Thank you.